# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 14, 2014          Decided May 30, 2014

No. 13-7044

VENANCIO AGUASANTA ARIAS, HUSBAND, ON BEHALF OF
HIMSELF, AS GUARDIAN OF HIS FOUR MINOR CHILDREN, AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, ET AL.,
APPELLANTS

v.

DYNCORP, ET AL.,
APPELLEES

Consolidated with 13-7045

Appeals from the United States District Court
for the District of Columbia
(No. 1:01-cv-01908)
(No. 1:07-cv-01042)

*Christian Levesque* argued the cause for appellants. With
her on the briefs were *Terrence Collingsworth* and *Eric Hager*.

*Eric G. Lasker* argued the cause for appellees. With him on
the brief were *Joe G. Hollingsworth* and *Rosemary Stewart*.

Before: TATEL, *Circuit Judge*, and SILBERMAN and
SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*:  Appellants, a group of Ecuadorian provinces and individual farmers, alleged that they were injured by an anti-drug herbicide spraying operation in Colombia, conducted by an American company.  In a series of rulings, the district judge dismissed all claims.  Some of those are appealed.  We affirm all but one.

I.

Since the late 1990s, the United States and Colombia have cooperated in a program known as "Plan Colombia," which encompasses a range of policies designed to combat Colombian drug cartels.  That includes aerial herbicide spraying targeting illegal coca crops. Defendant DynCorp, an American contractor, conducted these spraying operations using an herbicide called glyphosate.

On September 11, 2001,  plaintiffs filed a putative class action on behalf of all Ecuadorians who lived within ten miles of the Colombian border. They alleged that herbicide had drifted across the border from Colombia and that the planes themselves had actually crossed the border and sprayed in Ecuador. The plaintiffs invoked the district court's diversity jurisdiction and asserted a wide variety of tort claims for alleged injuries to health, property, and financial interests, relying on both Ecuadorian and District of Columbia law.  All parties apparently agree now, however, that D.C. substantive law governs. For reasons that are not entirely clear to us, the case proceeded at a glacial pace.

In 2006 and 2007, additional cases were filed in the Southern District of Florida, on behalf of other individual plaintiffs, as well as three Ecuadorian provinces. Those cases were transferred to our district court, where they were consolidated with the original suit. The initial plaintiffs dropped their class action demand at this time, and discovery then proceeded.

In 2007, the district court attempted to move the proceedings along by employing a requirement that plaintiffs submit answers to questionnaires concerning their alleged injuries – a common trial management technique in toxic torts cases with multiple plaintiffs. Such an order is sometimes called a *Lone Pine* order, in reference to *Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Superior Ct. Nov. 18, 1986). It generally requires plaintiffs in a toxic torts case to produce affidavits setting forth some basic information regarding their alleged exposure and injury. "In the federal courts, such orders are issued under the wide discretion afforded district judges over the management of discovery under Fed. R. Civ. P. 16." *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 340 (5th Cir. 2000). Even after an extension of the response deadline, numerous plaintiffs submitted incomplete responses. The court warned the plaintiffs that a failure to fully complete the forms by November 19, 2008, would lead to a dismissal with prejudice. The judge apparently relented, however, extending the deadline again to January 21, 2009. Then, a year later, in January of 2010, the court finally dismissed (with prejudice) those plaintiffs who had failed to submit complete responses to the questionnaires.

The court proceeded to hold that the Ecuadorian provinces had failed to demonstrate Article III standing. The provinces claimed that their budgets had been harmed by reduced tax

revenue and by necessary expenditures to address a public health crisis supposedly caused by the Plan Colombia spraying. But the court concluded that the provinces had either failed to demonstrate an injury cognizable for purposes of standing, or failed to demonstrate that DynCorp was the cause of the alleged injuries.

As for the remaining individual plaintiffs, the parties agreed that the court should focus on a limited number of "test plaintiffs," but disagreed as to how they would be chosen. Appellee argued they should be chosen half by the plaintiffs and half by defendant, but the court ultimately sided with plaintiffs who were to choose all the test plaintiffs. In their brief arguing for their position, the plaintiffs included a footnote (which is now hotly disputed) asserting that if the defendant's proposed test plaintiff selection method were accepted by the court, "no binding effect could be given to the outcome of the remaining claims," thereby, at least, implying that if the court accepted the plaintiffs' position, the result would bind all plaintiffs.

The court ultimately dismissed all of the remaining claims applicable to individual plaintiffs – both test and non-test plaintiffs – because they failed to provide expert testimony regarding the effects of glyphosate.

## II.

The plaintiffs advance a number of arguments. The Ecuadorian provinces insist that they do have Article III standing. The non-test plaintiffs argue that the court improperly extended its summary judgment beyond the test plaintiffs. Those plaintiffs who were dismissed for failing to submit complete responses to the questionnaires argue that dismissal was too harsh of a sanction, and all of the individual plaintiffs contend

that expert testimony was unnecessary to show that glyphosate had damaged the plaintiffs' crops, or to prove the torts of trespass, battery, nuisance, intentional infliction of emotional distress, or negligent infliction of emotional distress.

A.

We first consider the Ecuadorian provinces' Article III standing. They claim that the aerial spraying has caused health problems and driven large numbers of people away from the affected areas, which in turn forced the provinces to invest in additional schools, health centers, and other infrastructure along the border. The spraying allegedly has also cost them tax revenue – which can be estimated by comparing their annual budget deficits with their generally balanced budgets before the aerial spraying began. Indeed, it is asserted that the provinces' entire budget deficits are attributable to DynCorp's actions.

The district court correctly concluded, however, that the provinces had either failed to allege an injury-in-fact, or failed to present facts sufficient to demonstrate that these financial injuries were fairly traceable to DynCorp's spraying. *See Sierra Club v. E.P.A.*, 292 F.3d 895, 898 (D.C. Cir. 2002). Lost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing. *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). And the provinces' own expert noted that there are a number of economic and environmental factors that were responsible for the provinces' budget deficits, including labor disputes, difficulty collecting taxes, and even a volcanic eruption. Although the provinces generally allege that land and crops were damaged, they never claim to actually own the land or crops at issue.

To be sure, the provinces' direct expenditures on facilities like health centers could theoretically constitute an injury-in-fact for standing purposes, but the provinces failed to show that these injuries were "fairly traceable" to the defendants' actions. For example, the provinces contended that health centers were needed to address a high infant mortality rate and a number of prevalent diseases, but they do not even claim that these medical issues are a result of the spraying. Other testimony referred to explosions, grenades, and mortars across the border in Colombia, which are not even asserted to be DynCorp's responsibility. A defendant in a tort suit can, of course, be liable without being the sole cause of a plaintiff's injury, but the provinces have failed to demonstrate that DynCorp was any kind of cause of their alleged financial injuries. So we agree with the district court that the provinces lack standing.

B.

Turning to the individual plaintiffs, we easily reject the challenge brought by the 163 plaintiffs who were dismissed for failure to provide complete responses to the court-ordered questionnaires. As we noted, the court had ordered these plaintiffs to submit written statements detailing what specific damages they suffered and where they were located when they were allegedly exposed to the herbicide. After plaintiffs' repeated failures to adequately complete the responses – and three deadline extensions – the district court ultimately exercised its Rule 37(b) prerogative to sanction the plaintiffs by dismissing the case.

These plaintiffs argue that dismissal was too harsh of a sanction – that the judge abused his discretion. According to them, the district court failed to consider, as it was required to do under our precedent, whether "less dire alternatives" would

be adequate. *See Bonds v. D.C.*, 93 F.3d 801, 808 (D.C. Cir. 1996). Yet the court gave the plaintiffs every opportunity to complete their responses. Indeed, the court appears to have been, if anything, too patient, applying no sanctions at all for the plaintiffs' earlier failures. Only when further extensions were obviously futile did the court dismiss these cases. It would, thus, be impossible to conclude that the judge abused his discretion.

## C.

The district court dismissed all individual plaintiffs' claims for crop damages because they failed to provide expert testimony demonstrating "general causation." In a toxic torts case, proof of general causation is proof that the substance in question is capable of causing the particular injuries complained of.[1]

The plaintiffs argue that the district court erred in requiring such an expert. They claim – correctly – that there is no dispute as to whether glyphosate-based herbicides kill plants. But they attack a straw man. The district court required expert testimony not to prove that herbicides kill plants, but to determine whether the specific herbicide at issue was capable of causing the

---

[1]Proof of specific causation is still required to show that the substance in question did, in fact, cause the injuries. *Young v. Burton*, 567 F. Supp. 2d 121, 138 (D.D.C. 2008) *aff'd*, 354 F. App'x 432 (D.C. Cir. 2009). The distinction is important, because if the plaintiffs cannot show general causation, that is a reason to dismiss *all* of the crop damage claims, whereas proof of specific causation might be expected to vary from case to case.

*specific kinds of injuries* complained of. For example, plaintiffs claimed that the aerial spraying caused black spots to appear on their crops, but the defendant presented unrebutted expert testimony that glyphosate does not cause spotting. Because District of Columbia law requires expert testimony where the parties offer competing causal explanations for an injury that turn on scientific information, the district judge appropriately dismissed these claims. *See Baltimore v. B.F. Goodrich Co.*, 545 A.2d 1228, 1231 (D.C. 1988). A general causation expert would also, presumably, have been able to testify as to: the concentration of herbicide necessary to produce varying effects, the susceptibility of various types of plants, and the potential for the herbicide to drift outside of the immediate vicinity of a spraying operation. These are all issues that are not within the ken of the average lay juror.

## D.

More troubling is the plaintiffs' claim that the district judge improperly granted summary judgment against the non-test plaintiffs, along with the test plaintiffs, because the former never agreed to be bound by the latter's prospects. DynCorp contends that the fatal footnote constitutes consent – at least by implication – and that plaintiffs are therefore estopped. Although we doubt the footnote is sufficient to constitute formal consent, it certainly could have given that impression to the district judge.

Indeed, the plaintiffs never brought to the judge's attention their claim that they now assert on appeal, and, of course, we will not ordinarily consider an issue not presented below. Even if the plaintiffs were "surprised" – which may be doubtful – by the scope of the judge's order, that does not excuse their failure to bring the issue to the judge's attention through a Rule 59(e)

motion (to alter or amend the entry of judgment). We have squarely held that a party must preserve an issue for appeal even if the only opportunity was a post-judgment motion. *See Jones v. Horne*, 634 F.3d 588, 603 (D.C. Cir. 2011). And the misleading footnote makes the plaintiffs' failure to bring such a motion particularly egregious.

E.

The individual plaintiffs do present one winning argument. They assert that the district court was wrong to dismiss claims that do *not* require expert testimony, namely, claims for trespass, battery, nuisance, and emotional distress; which do not need proof of actual damage from glyphosate. The defendant contends that the plaintiffs have waived these arguments by failing to present them first to the district court. But, as the defendant concedes, the plaintiffs did raise at least most of these arguments; they merely did so in a separate summary judgment motion. Although arguments must be presented in the same *proceeding* in order to preserve the issue for appeal, *United States v. British Am. Tobacco (Investments) Ltd.*, 387 F.3d 884, 887-88 (D.C. Cir. 2004), they need not be presented in a single *filing*.

Not so, regarding simple trespass on plaintiffs' property; that argument was not presented at all before the district court. The plaintiffs argue in their appellate briefs that the tort of trespass does not require proof of actual damage. But this argument does not appear in their summary judgment motion. Rather, the plaintiffs only argued below that their trespass injury was crop damage, which could, they claimed, be demonstrated without expert testimony. As we noted, *supra*, the district court properly rejected that argument.

Plaintiffs' claims for battery, nuisance, and intentional infliction of emotional distress stand on different footing; none of those claims requires proof of physical harm, and we see no reason why expert testimony should be necessary to prove these claims. *See Evans v. Washington Ctr. for Internships & Academic Seminars*, 587 F. Supp. 2d 148, 150 (D.D.C. 2008) (Battery requires a showing of a harmful *or offensive* touching.); *Homan v. Goyal*, 711 A.2d 812, 817 (D.C. 1998) (A defendant is liable for intentional infliction of emotional distress when the plaintiff proves that the defendant's conduct was outrageous, intentional or reckless, and that it caused the plaintiff severe emotional distress.); *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 882 (D.C. 1982) ("A public nuisance is an unreasonable interference with a right common to the general public," and "private nuisance is a substantial and unreasonable interference with private use and enjoyment of land.") (citing Rest. 2d Torts §§ 821B(1), 821D (1979)). Of course, we do not mean to suggest as a matter of law that expert testimony is *always* unnecessary where these torts are concerned. We simply recognize that the defendant has presented no persuasive arguments as to why expert testimony is necessary here. Accordingly, the district court erred in dismissing these claims – at least on the basis of a failure to produce expert testimony.[2]

By contrast, plaintiffs' claim for *negligent* infliction of emotional distress is more vulnerable. To recover under this tort theory, plaintiffs must prove that they were within the "zone of

---

[2]It is entirely possible that plaintiffs may be unable to produce enough evidence relating to other elements of these torts, but that is an issue for the district court to consider in the first instance.

physical danger" created by the defendant's negligent action. A classic example is that of the reckless driver who speeds by a pedestrian, missing her by only inches. *See, e.g., Quinn v. Turner*, 155 Ariz. 225, 226 (Ct. App. 1987). But under District of Columbia caselaw a plaintiff must be in actual physical danger to recover. The question is not the reasonableness of the plaintiff's distress, but rather the unreasonableness of the defendant's conduct. For example, it may be entirely reasonable for a plaintiff to suffer severe emotional distress at seeing a relative injured, but a defendant does not breach a duty to plaintiffs unless he *actually* exposes them to danger. *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C. 1990). Because expert testimony is necessary to determine whether any plaintiffs were actually in the zone of physical danger, we affirm the district court's dismissal of the negligent infliction of emotional distress claims.[3]

\* \* \*

We remand for consideration of the individual plaintiffs' claims for battery, nuisance, and intentional infliction of emotional distress. In all other respects, the judgment of the district court is affirmed.

*So ordered.*

---

[3] A toxic exposure case differs from that of the reckless driver who barely misses a pedestrian because toxic torts plaintiffs will likely not know for certain, at the moment of exposure, whether they have had a close call. It is not until the nature of the substance is determined that it is possible to say for certain whether a plaintiff was within a zone of physical danger. That a plaintiff might be quite reasonably distressed at being sprayed with an unknown substance does not affect the result.