# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 24, 2014      Decided January 16, 2015

No. 13-7119

CITY OF NEW YORK,
APPELLANT

v.

NATIONAL RAILROAD PASSENGER CORPORATION, (AMTRAK),
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01169)

*Scott Shorr* argued the cause and filed the briefs for appellant.

*Daniel G. Jarcho* argued the cause for appellee. With him on the brief were *Craig D. Rust* and *Dennis M. Moore*.

Before: PILLARD, *Circuit Judge*, and SILBERMAN and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

SILBERMAN, *Senior Circuit Judge*: The dispute in this case is over who bears financial responsibility for the $25 million rehabilitation of a bridge carrying a public highway over a parcel of land in the Bronx: New York City or Amtrak. The City invokes a 1906 agreement obligating Amtrak's predecessor to maintain and repair the bridge. It asserts the agreement is a covenant running with the land which survived the land's subsequent Rail Act conveyance made "free and clear of any liens or encumbrances." The City also seeks to recoup payments it made to Amtrak in exchange for Amtrak's removal of electrical equipment attached to the bridge so the rehabilitation could proceed. The district court granted summary judgment to Amtrak on both claims, holding that the Rail Act extinguished the obligation and the City was not entitled to recover its already-incurred costs under the narrow theory of restitution it advanced. We affirm.

I.

The background facts giving rise to the Regional Rail Reorganization Act of 1973 and the history of the Shore Circle Road Bridge are detailed in the district court's thoughtful and comprehensive opinion. *City of New York v. Nat'l R.R. Passenger Corp.*, 960 F. Supp. 2d 84, 86-89 (D.D.C. 2013). We only briefly state the facts necessary to our disposition of the appeal.

Amtrak's predecessor purchased a parcel of land in Pelham Bay in the Bronx from the City in 1906. Pursuant to the terms of the deed, that railroad company built a bridge over the land, conveyed an easement to the City "limited for the purpose of the continued existence of a bridge carrying the public highway . . . across the railroad tracks," and promised that it and its successors would "maintain and keep [the bridge] in repair." Otherwise, the land would revert back to the City.

Over the decades, the land went through a series of transfers until it fell into Penn Central's hands. In 1970, Penn Central filed for bankruptcy along with seven other major railroad companies, creating a rail transportation crisis endangering the national welfare. Congress responded with the Rail Act. The Act sought to build new, financially viable railroads from the bankrupt rail system. Properties conveyed to Amtrak were to be conveyed "free and clear of any liens or encumbrances." 45 U.S.C. § 743(b)(2).

The Rail Act also created a Special Court to order the conveyances of rail properties and resolve disputes related to the reorganization. The Act endowed the Special Court with "original and exclusive jurisdiction [over] any action [] to interpret, alter, amend, modify, or implement any of the [court's conveyance orders]." *Id.* § 719(e)(2). That provision was subsequently interpreted by the Special Court to include any issue "*relating*" to conveyance orders or agreements entered pursuant to conveyance orders. *Consol. Rail Corp. v. United States*, 883 F. Supp. 1565, 1571 n.15 (Reg'l Rail Reorg. Ct. 1995) (emphasis added). In 1997, Congress abolished the Special Court as a separate tribunal and transferred its original and exclusive jurisdiction to adjudicate cases that implicate the conveyance orders to the district court for the District of Columbia. § 719(b)(2) (Supp. III 1997). Cases are appealable to this court pursuant to 28 U.S.C. §§ 1291-92, 1294. 45 U.S.C. §719(e)(3).

Amtrak received the land supporting the bridge pursuant to a Special Court conveyance order. The land was transferred free and clear of any liens or encumbrances but subject to all existing easements. Time passed, and the bridge fell into disrepair. The City began planning to replace the bridge in 1997, but Amtrak's electrical equipment attached to the underside of the bridge impeded the project. In 2003, the City

agreed pursuant to a Force Account Agreement to pay Amtrak to remove its equipment so the construction could proceed, but reserved the right to recover the cost of moving the equipment if a court determined that Amtrak was the responsible party.

The City filed a lawsuit in the Southern District of New York in 2010, seeking a declaratory judgment that Amtrak was liable for rehabilitation of the bridge pursuant to its predecessor's 1906 obligation to maintain and repair the bridge, and an order requiring Amtrak to reimburse the City for all of the City's already-incurred construction costs. Judge Crotty determined that the court lacked subject matter jurisdiction to hear the City's claims because they require the review and interpretation of a Rail Act conveyance order, and granted Amtrak's motion to transfer the case to the district court for the District of Columbia. Once here, the parties cross-moved for summary judgment, each asserting that the other was liable for the bridge's rehabilitation and reimbursement for the removal of the electrical equipment.

The district court granted summary judgment to Amtrak on all claims, holding that Amtrak has no obligation to maintain and repair the bridge that survives the Rail Act, whether the City's claim was based on a contract or a covenant.[1] The court held, therefore, that under New York law the City is responsible for maintaining the bridge because it owns it. *See also City of Philadelphia v. Consol. Rail Corp.*, 222 F.3d 990 (D.C. Cir. 2001) (holding the same under Pennsylvania law where a railroad's contractual obligation was extinguished by the Rail Act). Although the district court determined that Amtrak owed the City a duty to relocate the electrical facilities under New

---

[1]The City concedes that if the agreement is an executory contract it would not survive the Rail Act. We assume, *arguendo*, that the agreement is a covenant running with the land.

York's public utility rule, it found that the City could not recover its costs under either the emergency assistance doctrine (a narrow theory of restitution) or indemnification. *City of New York*, 960 F. Supp. 2d at 86-87. This appeal followed.

## II.

The City argues that we should interpret the Rail Act phrase "free and clear of any liens or encumbrances" consistent with the meaning of analogous bankruptcy provisions. We are told that since the maintenance and repair agreement is a covenant running with the land, under ordinary bankruptcy law, conveyances of a debtor's real property "free and clear of any liens or encumbrances" do not extinguish third-parties' deed-based covenants. The City challenges the district court's application of the Rail Act as unconstitutional because it would exceed the Congress's bankruptcy powers and result in an uncompensated taking. As to the restitution claim, which is purely a question of state law, the City concedes that it advanced meritless causes of action before the district court, but on appeal asserts a new one – unjust enrichment.

Amtrak responds with a number of arguments, ranging from a contention that the City's claims are untimely, to an assertion that the maintenance and repair agreement is an executory contract rather than a covenant running with the land and was thus disclaimed in the Rail Act conveyance. But its core argument regarding the bridge rehabilitation claim is that even assuming the City enjoyed a covenant running with the land, it was extinguished by the Rail Act.

Turning to the City's unjust enrichment claim, Amtrak asserts that the City forfeited this new argument by not asserting it to the district court. Were we to reach it nevertheless, Amtrak presents a series of arguments based on New York law to

support its position – that it owes no duty to the City to pay for the removal of that electrical equipment.

III.

We start with consideration of our jurisdiction. Neither party actually contests the district court's exclusive jurisdiction to decide cases that implicate conveyance orders under the Rail Act, and therefore our appellate jurisdiction. Nevertheless, we have an independent obligation to assure ourselves of jurisdiction. And the City relies on a New York federal district court case affirmed by the Second Circuit, *City of New York v. Nat'l R.R. Passenger Corp.*, No. 06-CV-793, 2008 WL 5169636, at *1 (E.D.N.Y. Dec. 9, 2008) *aff'd*, 373 F. App'x 84 (2d Cir. 2010), involving a facially similar case in which the district court took jurisdiction and, *in dicta,*[2] expressed the view that the Rail Act employed the principles of bankruptcy law. Although that court's subject matter jurisdiction was challenged, the court rejected the jurisdictional objection without discussion. (It is rather puzzling that the Second Circuit summarily affirmed, also without discussing its subject matter jurisdiction.) As noted above, any issue that relates to a conveyance order or agreement entered pursuant to a conveyance order falls within the exclusive jurisdiction of the Special Court. *See Consol. Rail Corp.*, 883 F. Supp. at 1571 n.15. Since that case involved a deed implementing a Rail Act conveyance order, as does ours,

---

[2]The district court held that a condition to an easement had survived the Rail Act conveyance where the parties both agreed that the easement itself was not extinguished. The court did not opine on the effect (if any) of the Rail Act on covenants. *City of New York*, 2008 WL 5169636, at *8.

we simply do not understand why the New York district court assumed jurisdiction.[3]

The City's claim that the Rail Act incorporated principles of the Bankruptcy Code and therefore a covenant running with the land per New York law would not be extinguished by 743(b)(2) as a "lien or encumbrance" is quite weak. Indeed, even if we granted the premise, it is by no means clear under New York law, which would be used in a bankruptcy court to determine the property rights in bankrupt's estate, that any alleged covenant would survive.[4]

Be that as it may, appellant's premise is quite wrong; the Rail Act uses different language than the Bankruptcy Code. 743(b)(2) provides flatly that a rail property is conveyed "free and clear of any liens or encumbrances," whereas the Bankruptcy Code permits a trustee to sell a debtor's property interests "free and clear of any interest . . . *only if* [one of five conditions is met]," 11 U.S.C. § 363(f) (emphasis added) – essentially assuring the owner of a property interest that it gain monetary satisfaction if its property rights are extinguished. The Rail Act simply does not provide the same protection for a holder of a property interest. To be sure, it has been recognized that such an entity had the right to make a monetary claim in the Penn Central bankruptcy proceeding. Indeed, the City of New

[3]Because the Eastern District lacked jurisdiction, we are disposed to ignore its view of the relationship between the Rail Act and the Bankruptcy Code.

[4]N.Y. Real Prop. Acts. Law §§ 1951-1955 allows courts to terminate covenants in several circumstances, including upon payment of damages. *See 328 Owens Corp. v. 330 W. 86 Oaks Corp.*, 865 N.E.2d 1228, 1229-30 (N.Y. 2007). In any event, a covenant is indisputably an encumbrance under New York law. *Nicholson v. 300 Broadway Realty Corp.*, 164 N.E.2d 832, 834 (N.Y. 1959).

York was a creditor in that proceeding – and received compensation for a tax lien. And the Supreme Court has held that any creditor who did not receive full value for a lien would have a remedy under the Tucker Act. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 154 (1974).

Appellant's argument that the Rail Act should be interpreted with the Bankruptcy Code in mind is not a new claim to our court. Ironically, it was Conrail, Amtrak's statutory cousin, that made that argument in an effort to avoid pre-Rail Act tort claims in *Consolidated Rail Corp. v. Ray*, 632 F.3d 1279 (D.C. Cir. 2011). But we squarely held that since § 743(b)(2) uses different language than the Bankruptcy Code, the latter "does not inform our reading of the former." *Id*. at 1282; *see also Penn Cent. Corp. v. United States*, 862 F. Supp. 437, 462 (Reg'l Rail Reorg. Ct. 1994). Appellant's effort to distinguish *Ray* is ineffective.

Finally, there remains appellant's constitutional claim; that an interpretation of Section 743(b)(2) which is contrary to the Bankruptcy Code – allowing extinction of property claims that would allegedly survive bankruptcy – would be unconstitutional because the Rail Act was passed pursuant to the bankruptcy power, and the Bankruptcy Code represents the outer limit of Congress's bankruptcy authority. The City points us to no authority to support the latter point, and we disagree as to the first. In fact, the Supreme Court has said that the Rail Act was not "*merely* an eminent domain statute;" Congress did draw upon its bankruptcy authority. *Regional Rail Reorganization Act Cases*, 419 U.S. at 152 (emphasis added). And as Judge Friendly on the Special Court recognized, Congress did not limit itself to bankruptcy powers. It also drew on its eminent domain authority under the Commerce Clause. *See In re Penn Cent. Transp. Co.*, 384 F. Supp. 895, 949 (Reg'l Rail Reorg. Ct. 1974). It was this latter authority that was the basis for holding

that any inadequacies in the compensation afforded under the Rail Act could be recovered in an action in the Court of Claims under the Tucker Act (which disposes of appellant's claim that the district court's opinion results in an uncompensated taking).

In sum, we quite agree with the district court that the City's claim against Amtrak for the rehabilitation of the bridge should be rejected.

## IV.

The City, on appeal, has reformulated its restitution claim for the $1.16 million Amtrak was paid under the Force Agreement as an "unjust enrichment" claim. It concedes that its suit in the district court based on the "emergency assistance" theory of restitution was in error but it argues, essentially, that was simply a labeling matter and, after all, the district court did conclude as a matter of law that Amtrak owed a duty to repay the money. *See Transit Comm'n v. Long Island R.R. Co.*, 253 N.Y. 345, 351(N.Y.1930) (public service corporations maintain rights in streets but are bound by the "public utility" doctrine to relocate their structures at their own expense whenever the public health, safety or convenience requires).

We are not at all convinced that the duty the district court determined exists because even assuming a railroad company was a "public utility," we can find no case imposing a removal duty on a public utility whose installments did not actually occupy public land. The duty is based on the proposition that utilities assume the risk of relocating their structures at their own expense as a condition of being granted the special privilege or "franchise" of installing structures on or embedding them in public property in the first place. *See, e.g.*, *New York Tel. Co. v. City of Binghamton*, 219 N.E.2d 184, 186-87 (N.Y. 1966). But here, the record shows that the electrical equipment

actually occupied Amtrak's air space and was not on or in City property, and that the insulators that touched the bridge were placed there, not pursuant to a special privilege granted by the City, but for the City's benefit. The only structure abutting the bridge was used to insulate it from electrical current, so the benefit arguably inures to the City.

In any event, we have authority to reach arguments not presented to the district court only under exceptional circumstances. *Potter v. District of Columbia*, 558 F.3d 542, 547, 551 (D.C. Cir. 2009). We generally exercise our discretion, for example, "in cases involving uncertainty in the law; novel, important, and recurring questions of federal law; intervening change in the law; and extraordinary situations with the potential for miscarriages of justice." *Flynn v. C.I.R.*, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001) (citations omitted).

On its way to concluding that Amtrak did not owe the City restitution under New York's narrow "emergency assistance" theory (because bridge repairs were not immediately necessary to stave off an emergency), the district court nonetheless determined, as one of the elements of the emergency assistance inquiry, that Amtrak owed the City a duty to remove its electrical equipment and insulators pursuant to New York's "public utility" rule. *City of New York*, 960 F. Supp. 2d at 98. It could be thought that this is therefore a case of extraordinary circumstances with the potential for a miscarriage of justice, since the district judge did decide the underlying issue – whether Amtrak owed the duty. To be sure, the City did raise a general restitution claim, under the public utility rule *simpliciter*, in its summary judgment briefing before the district court. *See* New York Motion for Summary Judgment at 27-29, *City of New York*, 960 F. Supp. 2d 84 (No. 11–1169); New York Reply-Opposition to Amtrak's Cross-Motion for Summary Judgment at 20-21, *City of New York*, 960 F. Supp. 2d 84 (No.

11–1169). But the City never brought to the district court's attention the apparent contradiction in its opinion, and affirmatively disavowed in this court that it had raised the broader restitution theory below. Appellant Br. 17, 65.

Appellant's restitution argument seems to us to raise an issue of first impression. Therefore, even if we were to reach it, we would be inclined to certify the issue to the New York Court of Appeals. We decline to decide the issue for another reason, however: the City did not seek a "rehearing" as a motion under Rule 59(e) or 60(b)(6) before the district judge. It might be thought that the district judge virtually invited such a motion by explicitly holding that Amtrak owed the City the duty. And it is hard to imagine that the district judge would then have denied a Rule 59(e) or 60(b)(6) motion. The standards for granting such a motion are virtually the same as ours for entertaining a new argument not presented in the district court. So if it would be appropriate for us to reach the argument on appeal, it certainly would have been appropriate for the district court to entertain it first.

We have previously held that a party seeking to raise a new issue on appeal should first present it to the district court pursuant to a Rule 59(e) or 60(b)(6) motion. *Arias v. Dyncorp*, 752 F.3d 1011, 1016 (D.C. Cir. 2014); *Jones v. Horne*, 634 F.3d 588, 603 (D.C. Cir. 2011). Where a party makes such a motion, it can no longer be said that an argument was "not made in the lower tribunal," *Flynn*, 269 F.3d at 1068, and we will therefore review it as we would any other claim preserved for appeal. Our respect for the district judges suggests we continue to insist that a party wishing to raise a new issue after judgment first advance it before the district court.

In sum, since we perceive no excuse for appellant not filing such a motion, we reject its refashioned claim.

12

\* \* \*

For the foregoing reasons, the judgment of the district court is

*Affirmed.*