# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 10, 2021　　　Decided December 30, 2022

No. 21-7021

NATIONAL RAILROAD PASSENGER CORPORATION, DOING
BUSINESS AS AMTRAK,
APPELLEE

v.

SOUTHEASTERN PENNSYLVANIA TRANSPORTATION
AUTHORITY,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-00537)

———

*W. Eric Pilsk* argued the cause for appellant. With him on
the briefs were *Charles A. Spitulnik* and *Paul A. Cunningham*.

*Sean Marotta* argued the cause for appellee. With him on
the brief were *Neil K. Gilman* and *Catherine E. Stetson*.

Before: Rogers[*] and Rao, *Circuit Judges*.[†]

Opinion of the Court filed by *Circuit Judge* Rao.

Rao, *Circuit Judge*: This case concerns the allocation of rail properties and rail service in the Philadelphia region. The National Railroad Passenger Corporation—better known as Amtrak—connects Philadelphia to cities up and down the Northeast Corridor. The Southeastern Pennsylvania Transportation Authority, or SEPTA, operates local commuter trains in Philadelphia and its suburbs. Amtrak and SEPTA dispute ownership of the Commuter Easement that grants access to Amtrak's Philadelphia-area rail lines and stations. The original owner of the Easement was the now-defunct Consolidated Rail Corporation ("Conrail"). SEPTA claims that a series of federal rail statutes gave it an option to acquire the Easement from Conrail, and that it exercised that right in 1982. Amtrak claims that when SEPTA tried to acquire the Easement, Amtrak exercised a contractual right of first refusal and purchased the Easement, and therefore SEPTA has no right to access Amtrak's lines and stations.

The district court agreed with Amtrak and held the Easement was never effectively conveyed to SEPTA. We reverse. Because SEPTA had a public right to acquire the Easement, Amtrak had no authority to block Conrail from giving it to SEPTA.

---

[*] Judge Rogers took senior status after oral argument in this case.

[†] Senior Circuit Judge Silberman was a member of the panel and participated in oral argument before his death on October 2, 2022. Judges Rogers and Rao have acted as a quorum with respect to this opinion. *See* 28 U.S.C. § 46(d).

3

I.

A.

In response to a series of rail bankruptcies that threatened the viability of intercity rail travel, Congress passed the Regional Rail Reorganization Act of 1973 ("Reorganization Act"). *See* Pub. L. No. 93-236, 87 Stat. 985 (1974) (codified as amended at 45 U.S.C. §§ 701–797m). In order to turn the Northeast Corridor "into an economically viable system capable of providing adequate and efficient rail service," Congress created three new entities. 45 U.S.C. § 701(b)(2). The first was the Railway Association, an advisory body with delegated authority to develop a comprehensive Final System Plan for reallocating the properties of the Corridor's bankrupt railroads among still-viable service providers. *See id.* §§ 711–12, 716–17. Second, Congress created a Special Court to order the conveyance of these properties in the manner set out in the Final System Plan, *see id.* §§ 719(b), 743(b)(1), and vested that court with "original and exclusive jurisdiction" over all disputes relating to the Plan, *id.* § 719(e). Finally, Congress created Conrail, a private, for-profit railroad company charged with providing rail service on some of the defunct companies' lines. *See id.* §§ 741–42.

The Railway Association published the Final System Plan in 1975.[1] The Plan made three property designations that are central to this case. First, it directed that Philadelphia-area lines and stations primarily used for passenger service between northeastern cities would be initially conveyed to Conrail and then immediately reconveyed to Amtrak. Second, the Plan

---

[1] Pursuant to the Reorganization Act, the Railway Association submitted the Final System Plan to Congress, and the Plan was "deemed approved" when neither house passed a resolution of disapproval. *See* 45 U.S.C. § 718(a).

"reserve[d] to ConRail appropriate trackage rights for the operation of commuter services" along the lines given to Amtrak, as well as a right to access and use associated "[s]tations, yards, [and] maintenance and service facilities." Third, the Plan directed that Conrail's rights to use and access Amtrak's Philadelphia-area lines and stations would be "available for purchase or lease" by SEPTA, consistent with 45 U.S.C. § 716(c)(1)(D), if SEPTA chose to provide commuter service itself. The Plan referred to this purchase-or-lease right as SEPTA's "option interest."

SEPTA did not initially exercise its purchase-or-lease option, choosing instead to pay Conrail to offer commuter service on its behalf. In 1976, Conrail therefore acquired the bankrupt rail companies' Philadelphia-area tracks, stations, and associated facilities and handed over to Amtrak those properties designated by the Plan. At the same time, Conrail and Amtrak memorialized Conrail's rights to access and use Amtrak's lines and stations through the Commuter Easement that is at the heart of this case.

The Commuter Easement's terms expressly identified it as the "easement and right … contemplated for retention by [Conrail] under the Final System Plan" so that Conrail could provide "commuter passenger service to the full extent required by the [Reorganization] Act." Cf. *Trustees of Prop. of Penn Cent. Transp. Co. v. Consol. Rail Corp.*, 460 F. Supp. 1258, 1260 (Reg'l Rail Reorg. Ct. 1978) ("The transfer of [Northeast Corridor] … properties from ConRail to Amtrak was thus not a purchase in the ordinary sense but a division of rights in the conveyed properties between two governmentally supported corporations in a manner designed to effectuate the transportation plans of Congress."). The Easement entitled Conrail to operate commuter service on Amtrak's tracks and to use Amtrak's terminals and stations jointly with Amtrak. In

return, Conrail agreed to pay Amtrak the cost of operating the rail service. Finally, if Conrail ever "elect[ed] to abandon or assign" the Easement to a third party, Conrail agreed to give Amtrak "a first option to acquire such easement, or portion thereof, at the purchase price of one dollar ($1.00)."

B.

By the early 1980s, it had become increasingly clear that the railroad reforms had not achieved their stated purposes. Conrail, in particular, was hemorrhaging money. Congress decided to wind down Conrail's commuter operations and to transfer its commuter service to local commuter entities. Northeast Rail Service Act of 1981 ("NERSA"), Pub. L. No. 97-35, § 1133, 95 Stat. 643, 644–45 (codified at 45 U.S.C. § 1102). Under NERSA, Conrail would no longer provide commuter services. *Id.* § 1136, 95 Stat. at 647 (codified at 45 U.S.C. § 744a). Local transportation authorities could take over Conrail's commuter services. *Id.* § 1137, 95 Stat. at 647–49 (repealed 1994). Pursuant to NERSA, SEPTA executed a transfer agreement with Conrail in which SEPTA committed to provide commuter service in the Philadelphia region as of January 1, 1983, and Conrail agreed to convey the Commuter Easement (among other rail properties) to SEPTA before that date.

Amtrak got wind of SEPTA and Conrail's talks in August 1982. Amtrak wrote to Conrail, insisting that Conrail could not give the Easement to SEPTA without allowing Amtrak to exercise its right of first refusal. In response, Conrail explained that Congress had given SEPTA a statutory right in NERSA to acquire the Easement, and so Conrail was required to convey the Easement to SEPTA. Conrail then conferred with the Department of Transportation, which directed Conrail to convey the Easement to SEPTA. On December 22, 1982,

Amtrak invoked its right of first refusal and tendered the one-dollar payment to Conrail. Conrail returned the payment, explaining again that it was required to convey the Easement to SEPTA.

On December 29, Amtrak instituted an arbitration proceeding against Conrail, seeking a declaration that Conrail could not convey the Easement to SEPTA without first permitting Amtrak to exercise its right of first refusal. SEPTA was not a party to the Amtrak-Conrail arbitration agreement, and so was not joined in the arbitration proceeding. Two days later, Conrail conveyed the Easement to SEPTA via a quitclaim deed. SEPTA immediately began operating commuter service on the lines formerly run by Conrail.

After the arbitration panel ruled in Amtrak's favor, Amtrak asked SEPTA to provide a quitclaim deed for the Easement. SEPTA declined and recorded its deed in the appropriate Pennsylvania counties. To comply with the arbitration panel's decision, however, Conrail gave Amtrak a second quitclaim deed to the Easement. Amtrak again asked SEPTA to convey its Easement to Amtrak, and SEPTA again refused. Amtrak took no further action to clarify the Easement's ownership. Amtrak now claims that, upon its receipt of the second quitclaim deed from Conrail, the Easement merged into Amtrak's title to the underlying properties and was extinguished by operation of law.

In the final months of 1982—when Amtrak, SEPTA, and Conrail were haggling over the Easement—Amtrak and SEPTA separately negotiated an agreement over their shared use of Amtrak's Philadelphia-area rail properties, which they finalized on December 23 ("Access and Services Agreement"). Amtrak agreed to "permit SEPTA access to the [Northeast Corridor] and provide the type and level of services currently

provided to SEPTA by Conrail." In return, SEPTA agreed to pay Amtrak $795,000 per month for the "use of [Amtrak's] facilities and for [its] provision of services and train operations." These "services" and "operations" were not ones to which the owner of the Easement was entitled by right. Rather, as explained above, the Easement simply entitled its owner to access and use Amtrak's lines and stations, not to also receive rail-related "services" and operational support from Amtrak. The parties' Access and Services Agreement remains in effect today.

Amtrak and SEPTA also eventually executed a thirty-year lease ("Station Lease"), pursuant to which Amtrak gave SEPTA access to forty-seven of its stations in the Philadelphia region. SEPTA, in turn, paid Amtrak a nominal annual rent of one dollar and agreed to maintain the stations on Amtrak's behalf.

## C.

In the run-up to the Station Lease's expiration in 2019, Amtrak and SEPTA began negotiating a new agreement. Instead of the one dollar that SEPTA had been paying, Amtrak requested an "annual fair market rent of $1.5 million … with an annual escalation rate of 2%." *Petition by Se. Penn. Transp. Auth. for Relief Under 49 U.S.C. § 24903*, 2019 WL 1398080, at *2 (S.T.B. Mar. 27, 2019) (cleaned up). This would be in addition to the monthly $795,000 that SEPTA paid under the Access and Services Agreement. SEPTA insisted that, as the Easement's owner, it was entitled to use Amtrak's stations for a far smaller amount—namely, the costs Amtrak incurs by permitting SEPTA to use its stations to provide commuter service. According to Amtrak, this was the first time SEPTA had claimed ownership of the Easement since the early 1980s.

The parties' negotiations broke down, and this litigation ensued.

Seeking a declaration that SEPTA did not own the Easement, Amtrak sued SEPTA in the U.S. District Court for the District of Columbia. SEPTA counterclaimed, asking for a declaration that it owned the Easement, a declaration that it had a statutory right under the Plan and NERSA to access Amtrak's stations, and an injunction prohibiting Amtrak from denying it access to them. Both parties moved for summary judgment.

The district court held that SEPTA did not own the Easement. *See Nat'l R.R. Passenger Corp. v. Se. Penn. Transp. Auth.* ("*SEPTA II*"), 518 F. Supp. 3d 19, 33 (D.D.C. 2021). By its terms, the Easement gave Amtrak a right of first refusal if Conrail "shall elect to abandon or assign" it to a third party. The court reasoned that NERSA permitted SEPTA to enter negotiations over Conrail's properties but did not guarantee that such negotiations would succeed. *See id.* at 32. Conrail's decision to convey the Easement was therefore an election, triggering Amtrak's right of first refusal. *See id.* at 30.

The district court next found that Amtrak validly exercised its right of first refusal when it tendered the required one-dollar consideration to Conrail, and that Conrail's rejection of Amtrak's payment was ineffective. *Id.* Finally, the court rejected SEPTA's argument that it had a "statutory right to the Commuter Easement" that "trumps Amtrak's right of first refusal." *Id.* at 32. Because Amtrak had properly exercised its right of first refusal and subsequently acquired the Easement, SEPTA did not own it.

SEPTA timely appealed. "We review the District Court's grant and denial of summary judgment *de novo*." *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017).

9

## II.

The parties do not dispute our subject matter jurisdiction on appeal.[2] Nonetheless, we have an independent obligation to "assure ourselves of both the district court's and our own jurisdiction." *Wagner v. FEC*, 717 F.3d 1007, 1010 (D.C. Cir. 2013).

The Reorganization Act's Special Court was created to order the conveyances of rail properties and resolve disputes regarding such conveyances. *City of N.Y. v. Nat'l R.R. Passenger Corp.*, 776 F.3d 11, 13, 15 (D.C. Cir. 2015). In 1996, the Special Court's jurisdiction over disputes related to the Final System Plan was transferred to the District Court for the District of Columbia. *See* 45 U.S.C. § 719(b)(2). We have read this grant of jurisdiction "to include any issue relating to conveyance orders or agreements entered pursuant to conveyance orders," including a "deed implementing a [Reorganization] Act conveyance order." *City of N.Y.*, 776 F.3d at 13, 15 (cleaned up); *see also* 45 U.S.C. § 719(e)(2). Here, the Easement was created pursuant to a conveyance order: in its conveyance to Amtrak, Conrail reserved an easement, securing Conrail's trackage rights under the Final System Plan. To determine whether the Easement was properly acquired by SEPTA requires interpreting the language of the Final System Plan and the Easement created pursuant to it. Because this case

---

[2] SEPTA argued below that the district court lacked jurisdiction because of a jurisdiction stripping provision in NERSA, § 1137, 95 Stat. at 652. The district court denied SEPTA's motion to dismiss Amtrak's complaint for lack of subject matter jurisdiction because Congress repealed this jurisdiction stripping provision nearly three decades ago. *See Nat'l R.R. Passenger Corp. v. Se. Penn. Transp. Auth.* ("*SEPTA I*"), 393 F. Supp. 3d 1, 4 (D.D.C. 2019) (citing Act of July 5, 1994, Pub. L. No. 103-272, § 7, 108 Stat. 745, 1379, 1392 (49 U.S.C. prec. § 101)).

raises an issue relating to conveyance orders, the district court had jurisdiction under 45 U.S.C. § 719(e)(2), and we have jurisdiction under 28 U.S.C. § 1291.

### III.

Turning to the merits, we conclude that SEPTA possessed a public right to acquire the Easement in 1982, and therefore Amtrak's right of first refusal—a provision inserted into the Easement's operating agreement between Conrail and Amtrak—could not impede SEPTA's exercise of its option rights under the Plan.

### A.

It is an ancient principle that "*privatorum conventio iuri publico non derogat*"—or simply that private contracts cannot abrogate public laws. DIG. 50.17.45.1 (Ulpian, Ad Edictum 30). The Supreme Court has long recognized this principle, explaining, "Contracts, however express, cannot fetter the constitutional authority of Congress. … If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223–24 (1986). This principle explains why SEPTA's right to acquire the Easement persisted despite Amtrak's right of first refusal.

The Final System Plan, developed pursuant to a statutory directive and deemed approved by Congress, entitled SEPTA to acquire the Easement from Conrail.[3] As explained above, the Plan "reserve[d] to ConRail appropriate trackage rights for the

---

[3] SEPTA also argues that NERSA entitled it to acquire the Easement. Because the Final System Plan gave SEPTA a right to acquire the Easement from Conrail, we need not address that argument.

operation of commuter services" on Amtrak's lines, as well as access to associated stations. Separately, the Plan provided SEPTA may purchase or lease Conrail's trackage rights on lines given to Amtrak, along with Conrail's interests in the stations, structures, and facilities "associated with [the same] rail lines." Under the Plan, Conrail's rights were contingent: it was entitled to use Amtrak's properties to provide commuter service *only if* SEPTA chose not to purchase or lease Conrail's rights to use Amtrak's lines and stations. If SEPTA elected to do so, then Conrail was required to sell or lease those rights to SEPTA.

Conrail's access rights were memorialized in the Easement, which entitled Conrail to enjoy all the rights to access and use Amtrak's lines and stations designated to it in the Plan. But Conrail's rights remained subject to the Plan's condition—namely, that SEPTA would not "purchase or lease" Conrail's rights for its own use. In 1982, SEPTA did just that, informing Conrail that it had chosen to purchase all the property rights Conrail used to provide commuter service. Under the Plan, Conrail was required to convey to SEPTA its rights to access and use Amtrak's lines and stations. At the time, these rights took the form of the Easement.

Because Conrail was required by the Plan to convey the Easement to SEPTA on SEPTA's exercise of its option, Amtrak's contractual right of first refusal could not block the conveyance.[4] On this point, the Court's decision in *Preseault v. ICC*, 494 U.S. 1 (1990), is instructive. That case centered on an easement for train lines that traversed private land in Vermont. After the lines went unused for many years, the Special Court converted the lines into pedestrian trails. Under

---

[4] Amtrak could have invoked its right of first refusal to block the Easement's conveyance to other third parties, just not to SEPTA.

Vermont law, that would have extinguished the easement by abandonment. *See Lague, Inc. v. Royea*, 568 A.2d 357, 358 (Vt. 1989); *cf.* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 7.4 (AM. L. INST. 2000). Congress, however, had specified that the conversion of a federally regulated rail line into a pedestrian trail did not constitute abandonment. *See* 16 U.S.C. § 1247(d). As the Court recognized, that congressional directive trumped the property owner's reversionary interest under state law. *See Preseault*, 494 U.S. at 5–9. Here, likewise, SEPTA's right under the Plan to acquire Conrail's access to Amtrak's rail properties trumped Amtrak's right of first refusal under the Easement.

When it considered this same question in 1982, the Railway Association—the entity that drafted the Final System Plan—came to the same conclusion. The Final System Plan, it explained, "granted two independent sets of trackage rights over the Corridor concurrently." First, "Conrail was granted such trackage rights as were necessary" for the Northeast Corridor properties transferred from Conrail to Amtrak—the trackage rights disputed here. Second, the Plan "also reserves the same appropriate trackage rights … for transportation authorities," in the form of an option interest to purchase those rights from Conrail. Therefore, "Conrail's title [to the Easement] was subject" to SEPTA's trackage rights granted under the Final System Plan. "These rights had no termination date associated with them and, therefore, continue to the present time." In other words, Conrail reserved its right to the Easement when it transferred the Northeast Corridor properties to Amtrak, but it did so subject to SEPTA's independent "option interest" to purchase the Easement.

In sum, SEPTA maintained its option to lease or purchase trackage rights under the Plan, and this public option could not

be abrogated by the private conditions Conrail and Amtrak placed on the Easement's ownership.

## B.

Amtrak raises two primary arguments against this conclusion, but neither is persuasive.[5] First, Amtrak points out that the Plan did not, by its terms, give SEPTA a right to acquire the Easement and that "[t]he rights discussed in the Final System Plan are distinct from the rights contained in the Commuter Easement." Of course, the Plan did not specifically identify the Easement by name, since that instrument postdated the Plan. But the Plan *did* entitle SEPTA to purchase or lease from Conrail the same rights designated to Conrail for the provision of commuter service. In 1982, Conrail's rights took the form of the Easement. Short of conveying the Easement to SEPTA, therefore, Conrail had no way to honor SEPTA's option right to "purchase" them.

---

[5] We also reject Amtrak's threshold claim that SEPTA's request for declaratory relief is untimely. Amtrak maintains SEPTA should have sued in the 1980s, after the arbitration decision in favor of Amtrak. But Conrail had delivered the Easement to SEPTA, and SEPTA was not bound by the arbitral award because it was not a party to the arbitration agreement. 21 WILLISTON ON CONTRACTS § 57:19 (4th ed.). Moreover, Amtrak permitted SEPTA to use its stations for one dollar per year plus maintenance costs—terms consistent with SEPTA's ownership of the Easement. SEPTA had no reason to invoke the Easement until 2019, when the parties disputed the terms for a new station lease. In general, the statute of limitations for a declaratory judgment does not begin to run until "a substantial controversy" materializes. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Such controversy did not materialize until 2019, and SEPTA's claim is therefore timely under any statute of limitations identified by the parties.

Attempting to distinguish SEPTA's Plan rights from its claim to the Easement, Amtrak points out that, in order to gain access to Amtrak's lines and stations, SEPTA was required to negotiate a "reasonable reimbursement of costs" with Amtrak. 49 U.S.C. § 24903(c). Amtrak suggests, in other words, that SEPTA did not have a unilateral right to acquire the Easement, because it was required by NERSA to contract with Amtrak for access to its lines and stations. But that same reasonable-reimbursement condition also attached to Conrail's initial trackage and station access rights. That is why, in the Easement, Conrail agreed to reimburse Amtrak for the cost of operating rail service. The distinction that Amtrak posits is no distinction at all. Conrail had a property right under the Plan to use Amtrak's lines and stations in order to provide commuter service and was required to provide reasonable reimbursement to exercise that right. Similarly, SEPTA had an option under the Plan to purchase or lease from Conrail the right to use Amtrak's lines and stations, so long as SEPTA provided a reasonable reimbursement to Amtrak if and when it chose to exercise its option.

Second, Amtrak argues that even if the Plan gave SEPTA such an acquisition right, the Plan could not compel Conrail "to convey something Conrail never received—a Commuter Easement free of Amtrak's right of refusal." For the reasons given above, this argument rests on the false premise that Conrail and Amtrak were free to insert a right of first refusal clause that would be effective against SEPTA. Because the Plan gave SEPTA a right to purchase Conrail's rail properties, and because Conrail's right to use and access Amtrak's lines and stations took the form of the Easement, Amtrak's right of first refusal was a legal nullity with respect to SEPTA. That is to say, Conrail was required to convey the Easement to SEPTA and Amtrak's right of first refusal could not block that conveyance.

The district court's additional reasons for rejecting SEPTA's ownership claim over the Easement also fail to carry the day for Amtrak. The district court explained that there was no conflict between SEPTA's option under the Plan and Amtrak's right of first refusal because Conrail could have simply leased access to Amtrak's properties and there would have been no property left in Conrail's control for SEPTA to purchase. *Nat'l R.R. Passenger Corp. v. Se. Penn. Transp. Auth.* ("*SEPTA I*"), 393 F. Supp. 3d 1, 4 (D.D.C. 2019). But this hypothetical arrangement is not the case before us. Conrail did, in fact, retain the Easement. And SEPTA chose to purchase all of Conrail's property rights for the provision of commuter service, which included the Easement. As the bearer of a public "option interest" under the Plan, it was SEPTA's prerogative to choose whether, when, and how to purchase or lease Conrail's "trackage rights for the operation of commuter services."

The district court also observed that since 1982, SEPTA and Amtrak have entered into agreements governing their shared use of Amtrak's properties. The district court reasoned that if SEPTA in fact owned the Easement, these agreements would have been unnecessary. *See SEPTA II*, 518 F. Supp. 3d at 33. We find, however, that the parties' course of dealings is not inconsistent with SEPTA's ownership of the Easement. While SEPTA leased stations from Amtrak, it paid just one dollar for them. On the other hand, SEPTA paid Amtrak considerable sums under the Access and Services Agreement, which is still in effect and extends beyond rights under the Easement.

\* \* \*

For the foregoing reasons, we hold that the Final System Plan gave SEPTA a right to acquire the Easement, that

Amtrak's right of first refusal could not block the Easement's conveyance to SEPTA, and that the Easement was validly conveyed from Conrail to SEPTA in 1982. The judgment of the district court is therefore

*Reversed.*